# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JONATHAN OTTO,                                    :
                                                  :
                                      Plaintiff,  :
                                                  :
                  -against-                       :
                                                  :
HEARST COMMUNICATIONS, INC.,                      :
                                                  :
                                     Defendant.   :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/10/2018

1:17-cv-4712-GHW

OPINION AND ORDER

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

In June of 2017, Plaintiff Jonathan Otto attended a friend's wedding at the Trump National Golf Club in New Jersey. To the surprise of the celebrants, President Trump, the owner of the venue, crashed the wedding. The guests seem to have been delighted by the appearance of this unexpected guest, who lingered at the reception to take photographs with the newlyweds and sign autographs. Otto took the opportunity to capture the moment and snapped a photo on his iPhone, and later texted it to another guest at the wedding, Sean Burke. The next morning, Otto discovered that the image had gone viral: it had been published on the social media platform Instagram and in several media outlets, including Esquire.com, operated by Defendant Hearst Communications. Perhaps recognizing a lucrative business opportunity, Otto retained counsel the following day and quickly filed a copyright in the image. Otto brought this action, among several others against various media publishers, alleging that his copyright in the photograph had been infringed.

Before the court are cross motions for partial summary judgment. Otto seeks judgment on Hearst's liability for copyright infringement and the affirmative defenses asserted by Defendant. Pl.'s Memo iso Mot. for Part. Summ. J. (Dkt. No. 36) ("Pl.'s Memo"). Defendant seeks judgment on its fair use defense and on whether Hearst's alleged infringement was willful. Def.'s Memo iso

Mot. for Part. Summ. J. and Opp. to Pl.'s Mot. for Summ. J. (Dkt. No. 51) ("Def.'s Memo.").

Stealing a copyrighted photograph to illustrate a news article, without adding new understanding or

meaning to the work, does not transform its purpose—regardless of whether that photograph was

created for commercial or personal use. For this reason, among others, Plaintiff's motion is granted

in whole and Defendant's motion is denied in whole.

## II.    BACKGROUND[1]

### A.    Facts

#### 1.    The Parties

Plaintiff in this matter is Jonathan Otto, a Vice President at Deustche Bank. This suit arose

from a photograph Otto took on his iPhone at a private wedding, which was subsequently published

by several media outlets, including Defendant. Otto, self-described as just a "guy with an iPhone,"

is not and has never been a professional photographer. Pl.'s Memo. at 1; Def.'s 56.1 Stmt.[2] ¶¶ 7–8.

Defendant Hearst Communications, Inc. is a corporation organized under Delaware law.

Compl. (Dkt. No. 1) ¶ 6. Hearst is a well-known in the media industry; it owns newspapers,

television channels and stations, and publishes news in newspapers, magazines, and as relevant here,

on the Internet. Def.'s 56.1 Stmt. ¶¶ 12–13, 25. One of the media outlets owned by Hearst is the

Esquire magazine and website. *Id.* ¶¶ 25, 52. As a media conglomerate, Hearst sometimes licenses

photographs for use in its publications. *Id.* ¶¶ 14–18. To assist with this process, Hearst employs

in-house attorneys who are familiar with copyright law and licensing practices in the publishing

industry. *Id.*

---

[1] The following facts are undisputed unless otherwise noted.

[2] References to "Def.'s 56.1 Stmt." are to the Rule 56.1 statement and counterstatement submitted in connection with Hearst's motion for summary judgment and in response to Otto's motion and Rule 56.1 statement. References to "Pl.'s Resp. to Def.'s 56.1 Stmt." are to the Rule 56.1 counterstatement submitted by Otto in response to Hearst's motion and Rule 56.1 statement. In both cases, the Rule 56.1 counterstatements contain both the assertions of the moving party and the responses of the non-moving party.

### 2.  The Wedding

On June 10, 2017, Otto attended his friend's wedding at the Trump National Golf Club in Bedminster, New Jersey.  Def.'s 56.1 Stmt. ¶¶ 1, 6, 9.  To the guests' surprise, Donald Trump, President of the United States and owner of the club, appeared at the wedding.  *Id.* ¶ 3.  President Trump stayed to sign autographs and take photographs with the couple.  Ex C to Compl. (Dkt. No. 1-3) ("Esquire Article").  Seizing the opportunity to capture a "remarkable" event, Otto took several photographs of President Trump on his iPhone, including the one at issue in this matter (the "Photograph").  Def.'s 56.1 Stmt. ¶¶ 29–30, 32; *see also* Compl. ¶ 7; Ex. A to Compl. (the "Photograph").  The Photograph depicts President Trump with the bride, Kristen Piatowski.  Def.'s 56.1 Stmt. ¶ 28; *see* the Photograph.  Other wedding guests took similar photographs.  Def.'s 56.1 Stmt. ¶ 41.

At the time Otto took the Photograph, his intention was to document an important memory and newsworthy event.  Def.'s 56.1 Stmt. ¶ 33; Ex. A to Bishop Decl. (Dkt. No. 57-1) ("Otto Tr.") at 15:22–16:3, 19:7–9.  He planned to use the Photograph for personal, rather than commercial, purposes, and did not intend to share the photograph with friends and family or share it on social media.  Def.'s 56.1 Stmt. ¶¶ 31–32; Pl.'s Resp. to Def.'s 56.1 Stmt. (Dkt. No. 72) ¶¶ 123–24.  After taking the photo, Otto used an iPhone editing application to modify the image.  Def.'s 56.1 Stmt. ¶ 34.  Otto's name was entered in the copyright section of the Photograph's data.  *Id.* ¶ 35.  One other wedding guest, Sean Burke, asked Otto to share the Photograph with him, which he did by text message.  *Id.* ¶ 38.  Otto did not ask how Burke planned to use the Photograph, and the two did not discuss the Photograph any further that night.  Pl.'s Resp. to Def.'s 56.1 Stmt. ¶¶ 125, 127; Otto Tr. at 25:21-23.  Otto did not share the Photograph with anyone else and did not post the photograph on his own social media platforms.  Def.'s 56.1 Stmt. ¶¶ 36, 39.

### 3.  The Publication

On Saturday, June 11, the day after the wedding, Otto discovered that the Photograph he sent to Burke had been published in several media outlets, including TMZ, CNN, the Washington Post, and the Daily Mail.  Def.'s 56.1 Stmt. ¶ 42.  Otto reached out to TMZ via Twitter, notifying them that they had used his photograph without permission and that he wanted to be compensated and credited.  *Id.* ¶¶ 44–45.

Otto texted Burke and asked "Hey, TMZ & others using my photo above without credit/compensation.  You send to anyone?  I want my cut."  *Id.* ¶ 43; Otto Decl. iso Pl.'s Mot. for Part. Summ. J. (Dkt. No. 38) ¶ 12, Ex. E to Otto Decl. (Dkt. No. 38-5) ("Burke Text Messages").  Mr. Burke responded "Nope!  They reached out to kat," "kat" being another guest who had attended the wedding.  Def.'s 56.1 Stmt. ¶ 43; Otto Decl. ¶ 12; Burke Text Messages.  The Photograph was also posted to the social media platform Instagram by Laura Piatowski, a relative of the bride ("Ms. Piatowski").  Def.'s 56.1 ¶ 46.  It appeared that the news outlets had published the Photograph, among others, after finding them on Ms. Piatowski's Instagram account.  *Id.* ¶¶ 78, 80.  Many other photographs depicting President Trump at the wedding were also circulated on the Internet.  *Id.* ¶¶ 79, 81.

That same day, Hearst ran its own article on Esquire's website entitled "President Trump is the Ultimate Wedding Crasher."  Compl. ¶ 11; Esquire Article.  The article, written by Peter Wade, described President Trump's appearance at the wedding and was illustrated by three pictures, including the Photograph.  Def.'s 56.1 Stmt. ¶¶ 54, 67; *see* Esquire Article.  Wade, who is no longer employed with Esquire, had learned about the event from an article in *The Hill.*  Pl.'s Resp. to Def.'s 56.1 Stmt.  ¶¶ 144–45, 147.  In a Slack conversation with Esquire supervising editor Michael Sebastian, Wade stated that he was "trying to find the original source" and had come across several photos on Ms. Piatowski's Instagram.  Sebastian Decl. iso Def.'s Mot. for Part. Summ. J. (Dkt. No.

Case 1:17-cv-04712-LAK-JLC   Document 85   Filed 12/10/18   Page 6 of 31

54) ("Sebastian Decl.") ¶¶ 3–6; Ex. A to Sebastian Decl. ("Wade and Sebastian Slack

Conversation").  Wade used the photographs from Ms. Piatowski's Instagram in the article, crediting

her account as the source of the photos.  Def.'s 56.1 Stmt. ¶¶ 49–50; Pl.'s Resp. to Def.'s 56.1 Stmt.

¶¶ 138–39.

> The Esquire article reads:
>
> The most recognizable guest at Kristen Piatowski and Tucker Gladhill's
> wedding on Saturday night wasn't even invited.  President Donald Trump
> crashed the couple's wedding taking place at Trump National Golf Club in
> Bedminster, New Jersey.
> Photos surfaced on Instagram showing the husband and wife smiling with
> President Trump, who apparently stopped by to greet the couple and shake
> hands with the guests.
> Trump has become such a fixture at nuptials at his resorts, the Bedminster
> club once advertised a Trump appearance as a potential feature of booking a
> wedding there, according to a now-discontinued brochure obtained by the
> New York Times:
> "If [Trump] is on-site for your big day, he will likely stop in & congratulate
> the happy couple.  He may take some photos with you but we ask you and
> your guests to be respectful of his time and privacy."
> This was Trump's 24th visit to a golf course since he was elected.  In addition
> to making an appearance, it looks like Trump also took the time to sign
> autographs for fans.  One photo showed Trump with a Sharpie, waving a
> Make America Great Again hat.

Esquire Article.

Hearst did not know that Otto was the owner of the Photograph at the time of publication,

and the article did not credit Otto as the creator or the copyright holder of the work.  Def.'s 56.1

Stmt. ¶ 59; Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 149.  Hearst did not license the Photograph from Otto,

nor did it obtain Otto's consent for its use.  Def.'s 56.1 Stmt. ¶¶ 60–62.  In fact, Hearst did not have

any communication with Otto before receiving the complaint in this matter.  *Id.* ¶¶ 64–66.

Nonetheless, Hearst removed the Photograph from its website after this suit was filed.  Def.'s 56.1

Stmt. ¶ 109; Sebastian Decl. ¶ 15.  The photograph is stored on Hearst's servers.  Def.'s 56.1 Stmt. ¶

55.  Hearst does not charge for access to Esquire.com, but advertisements were displayed on the

web page displaying the Trump article and Hearst earned revenue from those ads.  Def.'s 56.1 Stmt.

¶¶ 56–57; Pl.'s Resp. to Def.'s 56.1 Stmt. ¶¶ 157–59.

### 4. The Suit

The day after the Photograph was published widely on the Internet, Otto hired counsel and registered the Photograph with the Copyright Office. Def.'s 56.1 Stmt. ¶¶ 83–84. The application was approved and Otto currently possesses a registration certificate, numbered VA 2-055-309 and dated June 12, 2017. *Id.* ¶¶ 90–92; *see also* Ex. L to Otto Decl. (Dkt. No. 38-12) ("Certificate of Registration"). Otto has not filed copyright infringement suits against either Burke or Ms. Piatowski for their alleged unauthorized distribution of the Photograph. Pl.'s Resp. to Def.'s 56.1 Stmt. ¶ 133. Otto has filed five copyright infringement suits in this District against various media companies for the unauthorized use of the Photograph, including this case. Def.'s 56.1 Stmt. ¶¶ 102–06. The other four suits have settled, at least one of which resulted into a retroactive licensing agreement for the Photograph's use. *Id.* ¶¶ 107, 110.

### B. Procedural History

Jonathan Otto initiated this action on June 21, 2017, Dkt. No. 1, and Defendant Hearst Communications, Inc. filed its answer on July 14, 2017, Dkt. No. 9.

On February 26, 2018 Otto filed a motion for partial summary judgement. Dkt. No. 36. Hearst filed its opposition and motion for partial summary judgment on March 26, 2018. Dkt. No. 51. On April 23, 2018, Otto filed its reply and opposition to Hearst's motion for partial summary judgment. Dkt. No. 70. Hearst filed its reply on May 7, 2018. Dkt. No. 75.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted). "Assessments of credibility and choices between conflicting versions of the

events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted). "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented." *Id.* at 553 (quoting *Anderson*, 477 U.S. at 252). "Summary judgment is improper if any evidence in the record from any source would enable a reasonable inference to be drawn in favor of the nonmoving party." *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, No. 15-cv-4244 (JGK), 2018 WL 4489278, at *2 (S.D.N.Y. Sept. 19, 2018) (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

When resolving cross-motions for summary judgment, the same standards apply. "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.* at 121 (citations omitted).

## IV. DISCUSSION

In his motion for partial summary judgement, Otto seeks judgment on Hearst's liability for copyright infringement, on Hearst's assertion of the fair use defense, and on Hearst's remaining affirmative defenses. In its cross-motion, Hearst also moves for partial summary judgment on its fair use defense, in addition to whether its alleged infringement was willful—the result of which determines Plaintiff's ability to seek statutory damages under 17 U.S.C. § 504(c). For the following reasons, Plaintiff's motion is granted in whole and Defendant's motion is denied in whole.

### A. Copyright Infringement

Plaintiff moves for summary judgment on the issue of copyright infringement by Hearst, alleging that Hearst has infringed on its copyright by unlawfully appropriating the Photograph for its use. Pl.'s Memo. at 9. The Court finds that the undisputed facts demonstrate Hearst's liability for copyright infringement and Plaintiff's motion is granted.

The Copyright Act grants the owner of the copyright the exclusive right to authorize the reproduction, distribution, and preparation of derivatives of the owner's work. 17 U.S.C. § 106; *see Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 546–47 (1985). To establish liability for an infringement claim, a plaintiff must prove that (1) she holds a valid ownership interest in the relevant copyrights, and (2) the defendant has "actually copied" her work. *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). After establishing actual copying, the plaintiff must demonstrate that the copying was unlawful by proving a "substantial similarity" exists between the defendant's work and the "protectable elements" of her copyrighted work. *Id.* The Defendant here only argues that there is a genuine dispute of material fact as to whether Otto has a valid ownership interest in the copyright of the Photograph.

### 1. Ownership of a Valid Copyright

A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright. *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2003) (citing 17 U.S.C. § 410(c)). Hearst argues that summary judgment should be denied on this issue because there exists a genuine issue of material fact regarding whether the copyright certificate proffered by Otto actually protects the photograph at issue. Def.'s Memo. at 37–38. This position is based on the fact that the copyright certificate that Otto originally submitted with his briefing did not include a copy of the photograph deposited with the United States Copyright Office. *Id.* However, the issue was easily resolved when Otto filed on the docket a certified deposited copy of

the copyright registration that included the Photograph, of which he requests the Court take judicial notice. *See* Mot. for Judicial Notice (Dkt. No. 76–78). Under Federal Rule of Evidence 201, the Court can take judicial notice of a fact not subject to reasonable dispute. Fed. R. Evid. 201(b). Here, Hearst has not set forth any evidence that would support a finding that the registration is invalid, and examining the record before the Court, no reasonable juror could find it so. The certified and deposited copy of the registration clearly shows that the photograph at issue is the one protected by the certificate. *See* Ex. B to Freeman Decl. iso Pl.'s Mot. for Judicial Notice (Dkt. No. 78-2) ("Certified Copyright Registration").

In addition, Otto has submitted three affidavits which support a finding that he owned a valid copyright in the Photograph. *See* Otto Decl. ¶¶ 23–26; Halperin Decl. iso Pl.'s Mot. for Summ. J. (Dkt No. 39) ("Halperin Decl.") ¶¶ 6–8; Liebowitz Decl. iso Pl.'s Opp. to Def.'s Mot. for Summ. J. (Dkt No. 71) ("Liebowitz Decl.") ¶¶ 4–8. The day after the Photograph appeared in media outlets, Otto retained the services of counsel who registered his copyright in the Photograph with the United States Copyright Office. Def.'s 56.1 Stmt. ¶¶ 83–84, 90–92. The first affidavit is from Otto, the second is from defense counsel Richard Liebowitz who supervised the application process, and the third is from Donna Halperin, an employee of the Liebowitz Law Firm who submitted the application. Defendant has moved to strike Ms. Halperin's affidavit on the grounds that Plaintiff failed to disclose her in his Rule 26 disclosures. Def.'s Mot. to Strike (Dkt. No. 55) at 3–4. The Court need not address this issue as the certified and deposited copyright registration and remaining two affidavits are more than sufficient to determine that Otto owned a valid copyright in the Photograph. Thus, regardless of the availability of Ms. Halperin's testimony, a reasonable jury could only find that Otto has satisfied the first element of his infringement claim.

### 2. Actual Copying and Substantial Similarity

Once a valid copyright registration is established, "a plaintiff must []show that his work was

actually copied . . . [and] then must show that the copying amounts to an improper or unlawful appropriation." *Castle Rock*, 150 F.3d at 137 (2d Cir. 1998) (citing *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139–40 (2d Cir. 1992).  Actual copying may be shown with direct or circumstantial evidence that the defendant had access to the copyrighted work and that there are probative similarities between the works.  *Id.*  After actual copying is established, the plaintiff must proceed to demonstrate that the copying was improper or unlawful by showing that the second work is substantially similar to protected elements of the original work.  *Id.*

Here, the parties do not contest the fact that Hearst actually copied Otto's photograph for its use in the Esquire Article, nor that the works are substantially similar because they are the same photograph.  The parties do not dispute Hearst did not have Otto's permission to use the Photograph, making the appropriation unlawful.  As such, the remaining elements of Plaintiff's copyright infringement claim have been met.

Accordingly, because Otto has established that he owns a valid copyright in the image, and because the actual copying and substantial similarity elements have been met, the Court finds that Hearst infringed upon Otto's exclusive right to control the reproduction and distribution of his photograph.  Plaintiff's motion for summary judgment on this issue is granted.

### B. Affirmative Defenses

Both Otto and Hearst seek summary judgment on Defendant's fair use defense.  Otto additionally seeks judgment on Hearst's remaining defenses:  (1) failure to state a claim (first defense); (2) non-infringement (third defense); (3) waiver (sixth defense); (4) consent (sixth defense); and (5) release (eighth defense).  Pl.'s Memo. at 23–24.  Where, as here, "a plaintiff uses a summary judgment motion . . . to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff may satisfy its rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case."

11

*F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex*, 477 U.S. at 325).

### 1. Fair Use

The purpose of copyright law is "[t]o promote the Progress of Science and useful Arts . . . ," U.S. Const., Art. I, § 8, cl. 8, and "expand public knowledge and understanding . . . by giving potential creators exclusive control over copying of their works, thus giving them a financial incentive to create informative, intellectually enriching works for public consumption." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015). "[W]hile authors are undoubtedly important intended beneficiaries of copyright, the ultimate, primary intended beneficiary is the public, whose access to knowledge copyright seeks to advance by providing rewards for authorship." *Id.* Thus, the fair use doctrine is a statutory exception to copyright infringement, permitting the unauthorized use of a protected work for certain purposes such as criticism, comment, teaching, scholarship, research, or, as relevant here, news reporting. 17 U.S.C. § 107.

"[T]he fair use determination is an open-ended and context sensitive inquiry," weighing four non-exclusive statutorily provided factors in light of the purposes of copyright. *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013). The fair use factors are (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. The Second Circuit has held that these statutory factors are not requirements and that the party requesting a judgment of fair use need not demonstrate that every factor weighs in its favor. *Cariou*, 714 F.3d at 705. However, "[t]he ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." *Castle Rock,* 150 F.3d at 141.

Although "[f]air use is a mixed question of law and fact," *Harper & Row,* 471 U.S. at 560, the Second Circuit has resolved fair use determinations at the summary judgment stage where the

moving party shows there are no genuine issues of material fact. *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991) ("The fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this area; however, it does not protect the copyright holder from summary disposition of her claims where there are no material factual disputes."); *see also Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998) (affirming summary judgment awarded to defendants on basis of fair use defense).

Specifically in cases pertaining to the media's secondary use of a copyrighted work, as in this matter, the Second Circuit has consistently held that that "First Amendment concerns are protected by and coextensive with the fair use doctrine." *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 74–75 (2d Cir. 1999); *see also Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1378 (2d Cir. 1993) (holding that "except perhaps in an extraordinary case, 'the fair use doctrine encompasses all claims of First Amendment in the copyright field.'") (quoting *New Era Pubs. Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576, 584 (2d Cir. 1989)). Therefore, "[w]hile an entity's status as a news publication may be highly probative on certain relevant inquiries, such as whether that entity has a fair use defense to copyright infringement, it does not render that entity immune from liability under intellectual property laws." *Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 489 F.3d 474, 480 (2d Cir. 2007). Otherwise stated, while free speech concerns are clearly relevant to the fair use analysis, the First Amendment does not "categorical[ly] protect[]" against claims of copyright infringement. *Id.* ("The fact that an entity is a news publication engaging in speech activity does not, standing alone, relieve such entities of their obligation to obey intellectual property laws.").

### i. Purpose and Character of the Work

The first factor, termed "the heart of the fair use inquiry," looks to the purpose and character of the secondary use and whether the use was for commercial or nonprofit educational purposes. *On Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001). The central purpose of the

first factor is to determine "whether and to what extent the work is transformative." *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579 (1994). "If the secondary use adds value to the original—if the copyrightable expression in the original work [must be] used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Castle Rock*, 150 F.3d at 141 (internal citations omitted); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) (observing that a transformative use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.") (citing *Campbell*, 510 U.S. 569, 579); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014) ("A use is transformative if it does something more than repackage or republish the original copyrighted work."). "With regard to photographs, "[u]sing a photo for the precise reason it was created does not support a finding that the nature and purpose of the use was fair." *See BWP Media USA, Inc. v. Gossip Cop Media, Inc.,* 196 F. Supp. 3d 395, 407 (S.D.N.Y. 2016).

First, to the extent that Defendant is arguing that its use of the Photograph in the article is fair because the Photograph was created for personal use and Hearst used it for news, the Court is unpersuaded. Def.'s Memo. at 11–12. The Court has not found any law supporting this point, and the existing precedent requires the opposite conclusion. Though news reporting is specifically named in 17 U.S.C. § 107 as a potential method of fair use, "a news reporting purpose by no means guarantees" such a finding. *Harper & Row*, 471 U.S. at 557. The Second Circuit has recognized that in matters where the secondary use falls under the category of news reporting, "the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014). When such uses are found to be transformative, courts often "emphasiz[e] the altered purpose or context of the work, as

14

evidenced by surrounding commentary or criticism." *Id.* To be clear, however, commentary is not necessary to the fair use defense, *only* that the secondary use provide "new expression, meaning, or message" to the original. *Cariou*, 714 F.3d at 706 ("The law imposes no requirement that a work comment on the original or its author in order to be considered transformative"). After all, "[t]he promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report . . . .'" *Harper & Row*, 471 U.S. at 557; *see also Swatch Grp.*, 756 F.3d at 85 ("A news organization thus may not freely copy creative expression solely because the expression itself is newsworthy.").

It would be antithetical to the purposes of copyright protection to allow media companies to steal personal images and benefit from the fair use defense by simply inserting the photo in an article which only recites factual information—much of which can be gleaned from the photograph itself. If so, amateur photographers would be discouraged from creating works and there would be no incentive for publishers to create their own content to illustrate articles: why pay to create or license photographs if all personal images posted on social media are free grist for use by media companies, as Hearst argues here? Indeed, it seems that this interpretation of the law would hinder "the Progress of Science and useful Arts," U.S. Const., Art. I, § 8, cl. 8, and the creation of "informative, intellectually enriching works for public consumption." *Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015).

The Court does not believe that this is an "extraordinary case" in which the need for news reporting should take precedence over copyright protections. *Twin Peaks*, 996 F.2d at 1378; *see also Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968) (holding that the defendants' use of images from a copyrighted film on President Kennedy's assassination was fair where there was a public interest in having the information available and the author presented his own theory and explanation of the murder). Though "news reporting is a widely-recognized ground for finding

fair use under the Copyright Act," the use of an image solely to illustrate the content of that image,

in a commercial capacity, has yet to be found as fair use in this District. *BWP Media,* 196 F. Supp.

3d 395, 407 (S.D.N.Y. 2016); *see also Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d

339, 352 (S.D.N.Y. 2017) ("CMG's articles did not comment on, criticize, or report news about the

Images themselves; instead, they used the Images as illustrative aids because they depicted the

subjects described in its articles. CMG's argument, if accepted, would eliminate copyright protection

any time a copyrighted photograph was used in conjunction with a news story about the subject of

that photograph. That is plainly not the law.").

Second, Hearst asserts that the article transformed the Photograph's purpose because Wade

added commentary regarding the President's availability for photographs at the wedding and a

broader trend in the President's behavior. Def.'s Memo. at 13–17. Defendant supports this point

by arguing that the image substantiates the story, as in *Calkins v. Playboy Enterprises Int'l, Inc.,* 561 F.

Supp. 2d 1136, 1141 (E.D. Cal. 2008), and *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir.

2000), two cases which are not binding on this Court.

In any case, those two cases are distinguishable from the present facts. In *Calkins,* the article

that used a copyrighted photograph added biographical information to provide insights to the public

on the personal life of the subject and in *Nunez,* the photograph "itself was the story" where the

media publisher reported on a controversy that arose *because* of the copyrighted photograph. Here,

unlike in *Calkins* and *Nunez,* the Esquire Article solely uses the Photograph for illustrative purposes

without adding "new information, new aesthetics, new insights and understandings" to the image,

*Castle Rock*, 150 F.3d at 141, in furtherance of "the Progress of Science and useful Arts." U.S.

Const., Art. I, § 8, cl. 8. Hearst used the Photograph for the same reason Otto took the Photograph:

to depict a memorable event—the President's presence at a private wedding. *See Psihoyos v. Nat'l*

*Exam'r*, No. 97-cv-7624 (JSM), 1998 WL 336655, at *3 (S.D.N.Y. June 22, 1998) ("The Examiner's

use is not transformative, because its piece uses the photo to show what it depicts."). Otto took the picture of President Trump with the bride because he wanted to capture something he determined was a noteworthy event. Esquire reported on the wedding and published the Photograph for this same purpose. Even examining Esquire's use of the Photograph from the wedding and the accompanying text as a whole, nothing about the article "places it in a context different from that in which it was displayed" as a standalone image. *BWP Media,* 196 F. Supp. 3d at 405.

The first factor also asks whether the image was used for a commercial or nonprofit educational purpose, where commercial use tends to weigh against a finding of fair use. *See NXIVM Corp. v. Ross Inst.*, 364 F.3d 471 (2d Cir. 2004). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. If the court determines that the work was transformative, the commercial or nonprofit nature of the use has less significance. *Id.* The Second Circuit has "recognized that '[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit.'" *Swatch*, 756 F.3d at 83 (alteration in original) (quoting *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983)). Accordingly, although a work may be commercial in nature, courts "do not place much significance on that fact" when the work has been found to be transformative." *Cariou*, 714 F.3d at 708. Here, Defendant does not dispute that it received advertising revenue from the Esquire Article, although, because Defendant's use was not transformative, its commercial purpose has less significance.[3]

---

[3]     Though the nature of Defendant's conduct may be relevant to the first factor, Plaintiff misstates the law by implying that the Court is required to consider "bad faith" under the first factor, then corrects this point in a later footnote. Pl.'s Memo. at 10, 16 (compare "Courts within the Second Circuit examine three sub-factors to determine the purpose and character of use, including whether the secondary use is:  (1) transformative; (2) for commercial purposes; and (3) in bad faith." with "While Plaintiff is not aware of any case that requires the Court to consider the defendant's conduct, *NXIVM Corp.* suggests that defendant's conduct may be weighed in the analysis of the first factor."). Plaintiff asserts that Hearst acted in bad faith because it "(a) failed to provide attribution on the Photograph; (b) failed to conduct

Because Defendant's use of the Photograph is not transformative and that use was commercial, the first factor weighs against a finding of fair use.

### ii.  Nature of the Copyrighted Work

The second factor, which looks to the nature of the copyrighted work, weighs in favor of Hearst.  In reviewing the second factor, courts will determine whether a work is expressive or creative rather than factual or informational, and unpublished versus published, with the scope of fair use applying more narrowly to creative and unpublished works.  *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006) (internal citations omitted); *see also Harper & Row*, 471 U.S. at 563–64.  "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."  *Harper & Row*, 471 U.S. at 563; *accord HathiTrust*, 755 F.3d at 96 ("The second factor considers whether the copyrighted work is of the creative or instructive type that the copyright laws value and seek to foster." (internal citation omitted)).

Photographs can vary on the spectrum of factual to creative.  A photograph's informational purpose "does not negate a finding of imaginativeness or creativity."  *Mathieson v. Associated Press*, No. 90-cv-6945 (LMM), 1992 WL 164447, at *6 (S.D.N.Y. June 25, 1992).  "Although photographs are often 'factual or informational in nature,' the art of photography has generally been deemed sufficiently creative to make the second fair use factor weigh in favor of photographer-plaintiffs."

---

due diligence concerning the identity; (c) removed the infringing content from its website after this lawsuit was filed; and (d) failed to consult counsel prior to publication."  The Court is not aware of any cases in this Circuit in which these factors alone indicate bad faith on Defendant's part and reminds Plaintiff that bad faith is not determinative of the first factor's outcome.  See *NXIVM Corp.*, 364 F.3d at 479.

Regardless, Plaintiff has not demonstrated that Defendant has acted in bad faith and this argument bears no weight on the first factor.  Indeed, the cases that Plaintiff relies on in support of this position are not on point.  Plaintiff cites *Rogers v. Koons* in arguing that Hearst's failure to credit Otto when using the Photograph demonstrates an "absence of good faith and fair dealing."  Pl.'s Memo. at 17.  However, Hearst did not take any affirmative action to remove the copyright information from the Photograph, unlike the defendant in *Rogers* who tore the copyright mark off of the original work.  See *Rogers v. Koons*, 960 F.2d 301, 309 (2d Cir. 1992).  Plaintiff additionally cites *Barcroft*, 297 F. Supp. 3d at 349, for its position that because Hearst took down the Photograph after receiving the complaint, it does not harbor a good faith belief in its own defenses.  Pl.'s Memo. at 17.  But *Barcroft* is not on point here.  The *Barcroft* court discussed the defendant's state of mind under the defense of waiver, and in any case, unlike the parties in *Barcroft*, Hearst and Otto never engaged in licensing negotiations prior to the photo's removal.

*Baraban v. Time Warner, Inc.*, No. 99-cv-1569 (JSM), 2000 WL 358375, at *4 (S.D.N.Y. Apr. 6, 2000).

Plaintiff here asserts that the Photograph is creative, but does not offer any analysis beyond that conclusory statement. However, unlike the staged photograph in *Barbaran*, the Photograph here was spontaneously taken to document its subjects, as they were in the moment. Otto did not direct or pose the subjects of the photo, nor control the lighting or the background. Based on these facts, the photograph is more factual than creative and narrowly favors Defendant. *See N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 620 (S.D.N.Y. 2015) (finding that the second factor favored fair use where the defendant "did not create the scene or stage his subjects—to the contrary, he plainly acknowledged that the photograph 'just happened.'").

Publicly released works qualify for far less protection from use by others than do unpublished materials. *Harper & Row*, 471 U.S. at 564. This is because a "plaintiff's right to control the first public appearance of the [photo] is not implicated [in such scenarios], nor does there exist any 'race to publish,'" which lends itself to a finding of fair use. *Mathieson,* 1992 WL 164447, at *6. Here, the parties do not dispute that the Photograph was widely disseminated and previously published prior to Defendant's use. As such, Hearst's article did not threaten Otto's right of first publication.

Because the Photograph is factual and published, this factor weighs in favor of fair use. However, this Circuit has noted that the second factor does not carry much weight in the fair use analysis and is "rarely found to be determinative." *On Davis*, 246 F.3d at 175.

### iii.  Amount and Substantiality of the Portion Used

The third factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," weighs against a finding of fair use. 17 U.S.C. § 107(3). Courts will ask "whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Blanch*, 467 F.3d at 257 (citing *Campbell*, 510 U.S. at 586). "The more of a

copyrighted work that is taken, the less likely the use is to be fair." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998).  The third factor of the fair use inquiry is influenced heavily by the first factor, focusing on whether 'the extent of . . . copying' is consistent with or more than necessary to further 'the purpose and character of the use.'" *Castle Rock*, 150 F.3d at 144 (quoting *Campbell*, 510 U.S. at 586–87).

Here, Hearst used a slightly cropped but otherwise unedited version of Otto's photograph. Plaintiff asserts that the article could have been published without Otto's photograph, either relying on the text alone to convey the message, or on the other two images used in the article which are not the subject of litigation.  Pl.'s Memo. at 20.  The Court declines to take a position on the editorial decisions made by Defendant.  The Court must additionally comment on Plaintiff's absurd position that Defendant should have hired its own photographer to take photos of President Trump at the wedding.  *Id.*  It would clearly be impossible for news companies, even ones as large as Hearst, to assign photojournalists to cover every single potential news story, let alone one that occurred unexpectedly and at a private, closed event.

Hearst correctly states that using a protected work in entirety constitutes fair use when the purpose of the use requires it.  *Bill Graham Archives,* 448 F.3d at 613.  Therefore, Hearst takes the position that the third factor is neutral at most because the article's use of the entire photograph was reasonable in light of its asserted purpose—"to provide commentary on the President's proclivity for seeking the attention of his fans and making himself available for photos and autographs." Def.'s Memo. at 11.  Defendant heavily relies on *Nunez* for its position that using less of the photograph would have made the photo useless to the story, and that a text-only article would not properly convey Hearst's message.  However, this matter is different from *Nunez*.  As discussed above, in *Nunez,* a core part of the Court's analysis was rooted in the fact that the newspaper's use of the photograph was transformative.  Therefore, in that instance, providing a full-scale version of the

photograph provided much-needed context for potential readers to understand the piece. *Nunez*,
235 F.3d at 24. In this matter, where Hearst used the entirety of the image in an article that neither
discussed the photograph itself nor transformed its use, no reasonable factfinder could find that the
third factor weighs in favor of Defendant.

### iv.   Effect of the Use on the Potential Market.

The fourth and last fair use factor examines the effect of the use upon the potential market
for or value of the copyrighted work. 17 U.S.C. § 107(4). The inquiry requires courts to look to
whether infringement will affect "traditional, reasonable, or *likely to be developed* markets." *Bill Graham
Archives*, 448 F.3d at 614 (emphasis added). The harm to the value of the original must be more than
speculative, such as where the secondary use "results in widespread revelation of sufficiently
significant portions of the original as to make available a significantly competing substitute." *Google,
Inc.*, 804 F.3d at 223. In short, this factor is "concerned with secondary uses that, by offering a
substitute for the original, usurp a market that properly belongs to the copyright holder." *Infinity
Broad. Corp.*, 150 F.3d at 110; *see Campbell*, 510 U.S. at 590 (holding that courts are required to
consider the extent of market harm in addition to 'whether unrestricted and widespread conduct of
the sort engaged in by the defendant . . . would result in substantially adverse impact on the potential
market for the original.'") (quoting Nimmer § 13.05 [A][4] (at 13–187 in 1997 edition)). Thus, "[f]air
use, when properly applied, is limited to copying by others which does not materially impair the
marketability of the work which is copied." *Harper & Row*, 471 U.S. at 566–67; see also *Twin Peaks*,
996 F.2d at 1377 (finding that the fourth factor favored plaintiff where the secondary use "risk[ed]
impairment of the market for the copyrighted works themselves or derivative works that the author
is entitled to license."). There also exists a "close linkage between the first and fourth factors, in that
the more the copying is done to achieve a purpose that differs from the purpose of the original, the
less likely it is that the copy will serve as a satisfactory substitute for the original." *Google, Inc.*, 804

F.3d at 223 (citing *Campbell*, 510 U.S. at 591).

The Second Circuit has "recognized the danger of circularity in considering whether the loss of potential licensing revenue should weight the fourth factor in favor of a plaintiff." *Ringgold v. Black Entm't Television, Inc.,* 126 F.3d 70, 81 (2d Cir. 1997) (citing *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 n.17, 931(2d Cir. 1994)). "Since the issue is whether the copying should be compensable, the failure to receive licensing revenue cannot be determinative in the plaintiff's favor." *Id.* "Only an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's effect upon the potential market for or value of the copyrighted work." *Am. Geophysical,* 60 F.3d at 930 (internal quotation marks and citation omitted). In cases where courts have found the fourth factor to weigh in favor of the defendant, it was undisputed that Plaintiff had no intention of entering the market, or was unable to take advantage of use in that manner. *See Swatch*, 756 F.3d at 91 (finding the fourth factor weighed in favor of the defendant where the defendant conceded that it had no interest in exploiting the protected aspects of the work); *Pac. & S. Co. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984) (noting that the fourth factor may not favor copyright owner when the secondary user "profits from an activity that the owner could not possibly take advantage of").

This is not the case here. It is clear from Otto's communications with TMZ and Burke the morning after the wedding that he did have an interest in entering the market upon realizing the value of his work. The creator of a work should not be precluded from future profits should they lack the marketing prowess to capitalize on their work at the time of creation. *Duncan*, 744 F.2d at 1496 ("Copyrights protect owners who immediately market a work no more stringently than owners who delay before entering the market."). Otto's status as an amateur photographer with an iPhone does not limit his right to engage in sales of his work.

Publishing the Photograph without permission essentially destroys the primary market for its

22

use.  As the owner of the work, Otto had the right to try to sell the Photograph to media outlets, if
he decided to do so.  The fact that the Photograph was reported on so widely indicates that there
was indeed a market for it.  Hearst has done nothing to show that the general audience for Otto's
photograph would not be equally satisfied with its version.  Thus, the publication can reasonably be
expected to harm Plaintiff's ability to license the work for publication and use in derivative works.
Because the images are nearly identical, Defendant's unauthorized publication impacts the market
for the work—simply put, more supply, less demand.  If the practice of using photographs without
licensing were to become widespread, "the market for such images would diminish correspondingly:
[i]f media outlets could use such images for free, there would be little or no reason to pay for
works."  *Barcroft*, 297 F. Supp. 3d at 355.  Accordingly, the fourth factor weighs against a finding of
fair use.

### v.  Balance

On balance, weighing the four non-exclusive factors in light of the purposes of copyright,
the Court finds that Hearst's use of the image was not fair.  The fact that Hearst's commercial use
did not transform the Photograph's purpose or add new meaning to the image; the fact that Hearst
used the work in its entirety; and the potential harm to any financial opportunities Otto might
reasonably pursue for use of the photo, outweigh the fact that the image is factual and published.
Allowing a news publisher to poach an image from an individual's social media account for an article
that does little more than describe the setting of the image does not promote "the Progress of
science and useful Arts."  U.S. Const., art. I, § 8, cl. 8; *see Castle Rock*, 150 F.3d at 141.  Accordingly,
no reasonable trier of fact could find in favor of the Hearst on the issue of fair use and Plaintiff's
motion for summary judgment on the defense is granted.

The Court must remind the parties, however, of the "fact-driven nature" of the fair use
inquiry and thus, the outcome may have been different in a similar scenario.  *Wright v. Warner Books,*

*Inc.*, 953 F.2d 731, 735 (2d Cir. 1991).  It is not unreasonable to think that the use could be considered fair in another matter involving a news publisher's incorporation of a personal photograph.  Though the Court did not find fair use in this particular instance, it does not preclude a finding of fair use in in other matters, depending on the balance of the fair use factors.  Therefore, the Court emphasizes that a finding of fair use in a matter involving personal photographs used by the media might be readily sustainable on facts other than those presented here.

### C.  Other Defenses to Liability

Plaintiff has moved for summary judgment on Defendant's remaining affirmative defenses: (1) failure to state a claim; (2) non-infringement; (3) waiver; (4) consent; and (5) release.  Pl.'s Memo. at 23–24.  Defendant has not responded to Plaintiff's arguments concerning any of the defenses other than waiver and consent.  However, Defendant's failure to oppose Plaintiff's motion on those defenses does not in itself justify the granting of summary judgment.  "[W]here the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'" *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)).  Plaintiff here has met his burden of demonstrating that no material issue of fact exists and judgment is granted.

First, regarding Otto's alleged failure to state a claim: a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  Here, Otto provided sufficient information in his complaint that allowed this Court to "draw the reasonable inference" that Hearst is liable for copyright

infringement, and thus, judgment is granted in favor of Otto.

Second, as discussed above, there is no genuine issue of material fact regarding Otto's copyright infringement claim, and the Court has found that Hearst is liable for infringement. Judgment is granted in favor of Otto on the defense of non-infringement as well.

The third and fourth defenses are based on similar arguments and therefore the Court will discuss them together. Hearst asserts that there are material questions of fact regarding whether Otto intended to waive his copyrights by sending the photograph to Burke. Def.'s Memo. at 39. Similarly, Hearst argues that Otto's communications with Burke indicates that Otto granted an implied license to use the Photograph and therefore consented to broad dissemination of the work. *Id.*

"To establish waiver, defendants must show that plaintiffs 'relinquished a right with both knowledge of the existence of the right and an intent to relinquish it." *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir. 1983) (citations omitted). "A waiver may arise by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage." *Capitol Records, Inc. v. Naxos of Am., Inc.*, 262 F. Supp. 2d 204, 211 (S.D.N.Y. 2003) (internal citations omitted). The Second Circuit has not yet developed a test for determining whether a copyright owner has conveyed an implied license, however, it "has followed the lead of other appeals courts and cautioned that implied non-exclusive licenses should be found only in narrow circumstances where one party created a work at the other's request and handed it over, intending that the other copy and distribute it." *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 120 (S.D.N.Y. 2012) (quoting *Weinstein Co. v. Smokewood Entm't Grp.*, LLC, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009)). "[T]he question comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue." *Id.* at 124 (citing *Ulloa v. Universal Music and Video Distrib. Corp.*, 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004)).

25

Hearst asserts that in providing the photo to Burke without "any restrictions on Mr. Burke's use or transmission of the Snapshot"—which resulted in the Photograph being published on social media and news outlets like Hearst—Otto may have intended to fully allow Burke to do "anything he wanted" with the Photograph. Def.'s Memo. at 39. However, in reviewing the evidence in the record, namely, Otto's interactions with Burke and TMZ after the Photograph was published, and the absence of any prior communication between Otto and Burke that could be construed as such a license, no reasonable jury could find that Otto intended to waive his rights in the Photograph by texting it to Burke nor that Otto intended for Burke to disseminate the Photograph. Even if Otto allowed Burke to share the image, there is no evidence that there was a similar agreement or "meeting of the minds" with Hearst, the party in this matter. Def.'s 56.1 Stmt. ¶¶ 64–62. As such, judgment is granted for Otto on the defenses of waiver and consent.

Finally, there is no evidence that Otto entered into an agreement with Hearst, or any other parties, to release his copyright infringement claims. Both parties agree that Otto and Hearst had no communication prior to this suit and that Hearst did not know Otto was the copyright owner of the Photograph until receiving the Complaint. Def.'s 56.1 Stmt. ¶¶ 64–66. Therefore, the affirmative defense of release must similarly be granted.

### D. Willfulness

Defendant has moved for summary judgment on the issue of whether its copyright infringement was willful. Def.'s Memo. at 40–42. The Court finds that, based on the record, a reasonable jury could differ as to whether Defendant is liable for willful infringement under 17 U.S.C. § 504(c) and thus, summary judgment must be denied.

After establishing liability for copyright infringement, the copyright owner may elect to recover either statutory damages or actual damages and profits. *See* 17 U.S.C. § 504(c)(1) ("[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of

actual damages and profits, an award of statutory damages for all infringements involved in the
action, with respect to any one work, for which any one infringer is liable . . . in a sum of not less
than $750 or more than $30,000 as the court considers just."). Should the copyright owner choose
to recover statutory damages, the burden falls on her to prove that the infringement is willful. *Id.* If
the Court determines that the plaintiff has met that burden, it may, in its discretion, enhance the
statutory damages award up to $150,000 per infringed work. *Id.* § 504(c)(2). Alternatively, if the
infringer "was not aware and had no reason to believe that" its acts "constituted an infringement,"
the Court may "reduce the award of statutory damages to a sum of not less than $200." *Id.*

A copyright infringement is "willful" within the meaning of Section 504(c)(2) if plaintiff
shows "(1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's
actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's
rights." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005). In
other words, defendant's knowledge may be inferred from his or her conduct. *N.A.S. Import, Corp.
v. Chenson Enterprises, Inc.,* 968 F.2d 250, 252 (2d Cir.1992). While "'[g]enerally speaking, summary
judgment is not a tool well suited to determining willfulness,'" *Young-Wolff v. John Wiley & Sons, Inc.,*
12-cv-5230 (JPO), 2016 WL 154115, at *10 (S.D.N.Y. Jan. 12, 2016) (quoting *Close-Up Int'l, Inc. v.
Berov*, 382 F. App'x 113, 117 (2d Cir. 2010) ), "'[t]he summary judgment rule would be rendered
sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an
otherwise valid motion.'" *Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134,
141 (2d Cir. 1991) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)); *see also Lipton v. Nature
Co.*, 71 F.3d 464, 472 (2d Cir. 1995) ("Although courts are generally reluctant to dispose of a case on
summary judgment when mental state is at issue, it is permissible to do so where there are sufficient
undisputed material facts on the record to make the question appropriate for summary judgment.").
"Nevertheless, at the summary judgment stage, although an inference of constructive knowledge or

reckless conduct seems the better of the possible inferences that can be drawn, we must still draw all inferences in favor of the non-moving party." *Island Software*, 413 F.3d 257, 264 (2d Cir. 2005).

Defendant argues that it is entitled to a finding of summary judgment that it did not willfully infringe because Plaintiff has not satisfied his burden under Section 504(c)(2). It is clear here that Hearst did not have actual notice of its infringement. Def.'s Memo. at 40. There is no evidence that Hearst knew of Otto's ownership of the Photograph before this suit was filed. The issue then is whether Hearst had constructive knowledge of its infringement.

Otto asserts that the fact that Hearst is in the publishing business and has knowledge regarding copyright law and licensing procedures supports a finding of willfulness, citing *Fallaci v. New Gazette* for this proposition. Pl.'s Opp. to Def.'s Mot. for Summ. J. and Rep. to Def.'s Opp. to Pl.'s Mot. for Summ. J. (Dkt. No. 70) ("Pl.'s Rep.") at 32–33. In that case, the defendant news publisher took an article originally published by the Washington Post and published a translation of it, using the original article's photograph and author's name. *Fallaci v. New Gazette Literary Corp.*, 568 F. Supp. 1172, 1173 (S.D.N.Y. 1983). The court's finding in *Fallaci* that the defendant willfully infringed was based on defendant's position as the publisher of a copyrighted newspaper *and* the fact that the defendant failed to appear and defend itself in the litigation. *Id.* However, it is not clear to this Court that an entity's status as a media publisher *alone* can establish a reckless disregard for the copyright holder's rights. *Fallaci* is consistent with other Second Circuit cases which have determined media publishers were willful where the incriminating facts included more than just defendant's presence in an industry that frequently interacts with copyright laws. *See Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1115 (2d Cir. 1986) (finding willfulness where the defendant had a copy of the contract for which the limit of its use could have been ascertained and circulated internal memoranda discussing those limits); *Castle Rock Entm't v. Carol Pub. Grp., Inc.*, 955 F. Supp. 260, 267 (S.D.N.Y. 1997), *aff'd sub nom. Castle Rock Entm't.*, 150 F.3d 132 (finding willfulness where

the defendants had constructive notice of the infringement because they had experience with the copyright laws and the work included copyright information, as well as actual notice of the infringement but continued to publish and distribute the work).  In other words, in those cases, defendants continued their infringement even "after receiving a specific warning."  *Twin Peaks*, 996 F.2d at 1382 (finding willfulness where the defendant knew of the copyright in the work and continued its use even after it had been warned that it was infringing).

Otto further argues that Hearst was "willfully blind" to the infringement because the supervising editor failed to review the Photograph prior to publication, consult counsel, and inquire regarding the identity of the copyright holder.  Pl.'s Rep. at 34–35.  However, the testimony of the supervising editor shows that he understood Wade to have complied with Hearst's custom and practice in obtaining images from their owners.  Sebastian Decl. ¶ 11.  There is no evidence to the contrary and despite the fact that discovery was completed here, Otto did not take the depositions of the Esquire Article's author or other Hearst employees, or any other individuals who could attest to the Defendant's state of mind at the time of publication.

Otto also highlights the fact that Hearst removed the Photograph prior to the filing of the suit as evidence that Hearst acted willfully.  Pl.'s Rep. at 1.  Plaintiff cites no cases which support this conclusion.  In similar cases, willfulness was found when defendants had been informed of their potential infringement and still continued to use the protected work.  *See N.A.S. Imp.,* 968 F.2d at 253 (holding that infringement was willful when the Defendant was notified in several letters of the infringement and had agreed to stop selling the infringing items but failed to do so); *Yurman Studio, Inc. v. Castaneda*, 591 F. Supp. 2d 471, 504 (S.D.N.Y. 2008) (finding that a genuine dispute of material fact existed where the defendants took several actions to prevent infringement, including stopping the sale of a number of infringing products at plaintiff's request, precluding summary judgment for plaintiff).  However, in this matter, unlike in Plaintiff's interactions with another media outlet, TMZ,

29

Plaintiff never contacted Hearst before filing the complaint.  The parties do not dispute that Otto never contacted Hearst, or that Hearst was never informed by Otto that its use of the photographs was impermissible prior to this litigation.

However, there do exist issues of material fact that could result in a reasonable jury finding for Otto, precluding summary judgment for Hearst.  Otto points to the fact that Hearst has been sued numerous times in the recent past as evidence of willfulness.  A reasonable jury could find that this allegedly recurring pattern of infringement warrants a willful blindness for acting in accordance with the copyright holder's rights, and therefore statutory damages.  *Walt Disney Co. v. Best*, No. 88-cv-1595 (SWK), 1990 WL 144209, at *2 (S.D.N.Y. Sept. 26, 1990) ("Shortly after agreeing to settle an earlier suit based on its sales of unauthorized and counterfeit watches, WTD was found to be selling unauthorized and counterfeit Mickey Mouse telephones.  Defendant's past infringement is a strong indication that it was familiar with the law and willfully violated it."); *Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 517 F. Supp. 900, 903–04 (S.D.N.Y. 1981) ("Moreover, it appears that Levine, through other of his corporations, has been a defendant to copyright infringement suits brought by converters ten times (including this action) in the last five years. . . .  The inference is inescapable that Levine has made a practice of copying the designs of other converters, and that an award of statutory damages is appropriate as a deterrent to further activity of this kind.").

In addition, Defendant highlights the fact that it retrieved the Photograph from the Instagram account of Laura Piatowski and credited Ms. Piatowski's Instagram account in its article.  Def.'s Memo. at 40–41.  However, this does not carry as much weight as Defendant might hope: even if Defendant believed Ms. Piatowski to be the true owner and copyright owner of the Photograph, there is no evidence in the record that would suggest that Hearst attempted to solicit a license or approval from Ms. Piatowski prior to using the Photograph.  *See* Sebastian Decl. ¶¶ 10–11.

Based on the undisputed evidence in the record and viewing all facts in the light most

favorable to Plaintiff, a reasonable jury could find that Hearst acted willfully when infringing on Otto's copyright and summary judgment must be denied.

## V. CONCLUSION

For the foregoing reasons, Otto's motion for partial summary judgment is GRANTED on the issues of Hearst's liability for copyright infringement and Hearst's assertion of its affirmative defenses. Hearst's motion for partial summary judgment is DENIED on both the issues of fair use and willfulness.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 36, 51, and 55.

SO ORDERED.

Dated:  December 10, 2018
New York, New York

_____
GREGORY H. WOODS
United States District Judge